## Case No. 8,416.

LIVINGSTON et al. v. MOORE et al.

[Baldw. 424.] [1]

Circuit Court, E. D. Pennsylvania.    Oct. Term, 1830. [2]

REAL PROPERTY—LIEN BY STATE—ACCOUNTS SETTLED—JUDGMENTS—ACTS OF LEGISLATURE.

1. The accounts between John Nicholson and the commonwealth, or some of them, were so settled and adjusted, that the balances or sums of money found due to the commonwealth, were good and valid liens on all the real estate of John Nicholson throughout the state of Pennsylvania.

2. The judgments rendered by the supreme court of the state in favour of the commonwealth against John Nicholson, also constituted good and valid liens upon all his real estate throughout the state.

3. The several acts of the general assembly of Pennsylvania, passed on the 31st of March, 1806 [4 Smith's Laws, 355], and on the 19th of March, 1807 [Id. 381], are not repugnant to or in violation of the constitution of the United States or of Pennsylvania, but are good and valid laws, and a rightful exercise of the powers of the legislature of Pennsylvania.

[This was a suit by the lessee of Livingston and Nicholson against Moore, Mahon and others.] The pleadings in this cause continued for upwards of two weeks, after which HOPKINSON, District Judge, delivered the following charge to the jury: [3]

The argument of this cause has been spread over a wide surface; and matters introduced into it, by way of illustration or otherwise, which have greatly increased its proper size and difficulties. The magnitude of the interests at stake, and the high principles which have been discussed, have excited extraordinary exertions from the able and distinguished counsel who have appeared before you. These are the rights and duties of the counsel. It is the business of the court to select from the great mass the matter most worthy of your attention, and to put it before you in as plain and simple a shape as it will admit of. Such will be my object on this occasion; and I trust that both you and I will enter upon our duties, and endeavour to perform them, with a single eye to the authority of the laws, which we are bound to obey, and which we are placed here to maintain. If the state to which we belong has fallen into an error, and injured one of her citizens by an illegal and unauthorized act of legislation, it is here that the error must be corrected, or the wrong will be perpetual. On the other hand, we are not to deal lightly with the power and rights of a state; or to overthrow her most solemn acts in a spirit of wantonness, or in the indulgence of speculative theories and ingenious refinements. The facts of this case, supported

[1] [Reported by Hon. Henry Baldwin, Circuit Justice.]

[2] [Affirmed in 7 Pet. (32 U. S.) 469.]

[3] The notes of the judge of the arguments of the counsel in this case, being mislaid, we are obliged to omit the usual outline of them. If they should be recovered, the outline will be given in an appendix.

by documentary testimony, are before us, with no contrariety in any thing material; and it is our duty to seek for the law which governs them, and so pronounce our judgment between the parties.

The title of the plaintiffs to the land in question is derived from J. Nicholson, who, in the year 1794, purchased it from the commonwealth. By an agreement made between the parties in this cause, it is stated that "as both parties claim under J. Nicholson, the title to the premises shall be admitted to have been in him. unless divested by the alleged lien and proceedings of the state of Pennsylvania." The defendants also claim title from the same J. Nicholson. They purchased their lands severally under the alleged lien and proceedings of Pennsylvania, and bought them from the state as the property of J. Nicholson; and "as and for such estate as the said J. Nicholson had and held the same at the time of the commencement of the lien of the commonwealth against the estate of the said J. Nicholson." By this clause in the act of assembly directing the sales, the original contract between the commonwealth and J. Nicholson is recognised and affirmed; his right and property in the lands admitted; and the commonwealth undertook to sell to the purchasers, the present defendants, only such estate as J. Nicholson held in them. Both parties then claim to have the title and right in these lands, which J. Nicholson once held, and the question now to be decided is, which of them has made good his claim; which of them has proved and maintained his right by the facts of the case and the law of the land. The original title being admitted to have been in J. Nicholson, his heirs, who claim immediately from him, have and hold his rights, "unless they have been divested by the alleged lien and proceedings of the state of Pennsylvania, under which the defendants have title."

This simple view of the case brings us at once to the question we have to examine, to wit: Has the lien of the state on this property, and the proceedings of the state to enforce that lien. divested J. Nicholson and his heirs of the title and estate he once had in it; and have the title and estate of John Nicholson become vested in the defendants by virtue of that lien and those proceedings? In pursuing this inquiry, our first step must be, to trace this lien and these proceedings from their origin to their termination; and examine whether they have brought these lands which J. Nicholson once held, lawfully and rightfully in the possession of the defendants, with all the title J. Nicholson had to them. If they have not done so, the defendants stand without title; they pretend to no other; the original rights of J. Nicholson in the land are unchanged by these proceedings, and the plaintiffs now holding those rights are entitled to recover. We must turn a careful attention to some of the laws of the legislature of Pennsylvania, and settle their meaning and effect, before we consider the various acts that have been done under them. The foundation of the title of the defendants is found in the twelfth section of the act of the 18th of February, 1785 [2 Dall. Laws, 251]. It enacts that "the settlement of any public account by the comptroller-general, and confirmation thereof by the supreme executive council, whereby any balance or sum of money shall be found due from any person to the commonwealth, shall be deemed and adjudged to be a lien on all real estate of such person throughout this state, in the same manner as if judgment had been given in favour of the commonwealth for such debt in the supreme court." This act, 1. gives a lien in favour of the commonwealth upon all the real estate of any person who shall be found to be a debtor to the commonwealth, in any balance or sum of money, by a settlement of his account by the comptroller-general, confirmed by the executive council; 2. this lien is to attach to the estate in the same manner as if a judgment had been given for the debt in the supreme court. I have not been able to satisfy myself of the meaning of the legislature in this last phrase—"in the same manner as if a judgment had been given in the supreme court." It is true that at the time when this act was passed, a judgment in the supreme court extended its lien over the whole state; but as the act had previously declared that the lien under it should be on all the real estate of the debtor, throughout the state, we must presume something more was intended by the subsequent clause.

The defendants contend, that by the words, "in the same manner," &c., the legislature intended that a purchaser under this lien should hold the land in the same manner as a purchaser under a judgment; and have the same protection against a subsequent reversal for any errors in the proceedings antecedent to the lien. If this construction be the true one, it will greatly abridge our inquiries in this cause. It closes up all the objections of the plaintiffs to the settlement of the accounts; and ratifies every irregularity. if there be any, prior to the lien. It therefore becomes necessary to examine, and, as far as we can, determine what was the meaning of the legislature in using these words, "shall be deemed and adjudged to be a lien on all the real estate of such person, throughout this state, in the same manner as if a judgment had been given in favour of the commonwealth against such person, for such debt in the supreme court." Did they mean to say that a sale made under a lien, in such manner as might afterwards be directed, for this act made no provision for a sale, should have the same protection or immunity from errors, as was given by the law of 1705 [1 Dall. Laws, 67], to sales by execution under a judgment? I have suggested already, that while the act of 1785 gives to the settlement of an account the effect of a lien by judgment, it provides no mode or proceeding by

which the lien is to be enforced, or the money secured by it collected. I cannot but infer from this that it was the intention of the legislature to make the debt secure by the lien; but that it was to be recovered and collected in the ordinary way of a suit, a judgment and an execution; the settlement being conclusive evidence of the debt. If this be so, then as the sale would also be by a venditioni by virtue of the judgment and levy, the purchaser would of course receive the deed of the sheriff, and have all the protection given by the ninth section of the law of 1705 to such a sale. In this view of the act no provision was necessary for the security of the purchaser, and therefore none can be intended by the words in question.

Again, the lien is given in the same manner as if a judgment had been given in the supreme court. Now a judgment in the supreme court had no special privilege or rights in this respect; but a purchase under a judgment in any other court had the same protection from disturbance in case of a reversal of the judgment as if it had been rendered in the supreme court. On comparing the twelfth section of the act of 1785 with the ninth section of that of 1705, it will be found very difficult to connect them in the manner contended for by the defendants. By the law of 1785, the lien is put on a footing with a judgment and no more. Now the provision of the law of 1705 has no reference to the judgment, but the sale made by the sheriff, by virtue of the levy, condemnation and venditioni exponas issued from the court. It is the sale which is not to be avoided by a reversal of the judgment, but the purchaser is confirmed in his right and title to the land, and its former owner, the defendant, can demand a restitution only of the money for which it was sold. If the act of 1785 had authorized an execution to issue, on the settlement which in truth is the substitute for the judgment as regards the debt, or a sale to be under any process to satisfy it in the same manner as a sale under a judgment, the conclusion might have been fairly made that the purchaser at such a sale would stand as secure in his title as a purchaser under a judgment. From 1785 to 1806, no provision was made to enforce the payment of the money secured by the lien in any other way than by a judgment and execution to be obtained as for any other debt. In 1806 [4 Smith's Laws, 355], an act was passed specially for the case of J. Nicholson, leaving the collection of the debts due from all other persons to the commonwealth, still to be made in the ordinary way. In the case of J. Nicholson, for reasons very apparent on the face of the act, the legislature provided a proceeding "for the more speedy and effectual collection of certain debts due to this commonwealth," by which, and another act passed in the following year, a sale was ordered to be made by commissioners as in the manner prescribed by the acts, of the lands of J. Nicholson, subject to the lien of the commonwealth. This sale differs in many respects from that authorized by the law of 1705, by virtue of a judgment and execution. The lands are to be sold absolutely, and not, as in the other case, only "where a sufficient personal estate cannot be found." No inquisition is to be held to ascertain the annual value of the land; and in other matters, it is wholly unlike a sheriff's sale; why then shall we say it is to have the effect of a sheriff's sale, in this particular, which effect is expressly given to that sale by the law which authorizes the sale in question? I am inclined to think this redundancy of expression is but a pleonasm which may occur in legislative compositions as in other works of the pen. The full and perfect validity of this act has not been questioned, nor could be. Every government assumes and rightfully has the power to take care of its own revenue, to protect it by extraordinary securities, to collect it by extraordinary remedies. Without this power and a liberal exercise of it, the government might be thrown into ruinous embarrassments and distressing disappointments, and delays in meeting the expenses of the public service. The United States by an act of congress are entitled to a preference in certain cases over all other creditors, and even a judgment will not protect a creditor from the extraordinary right of the government for the payment of an ordinary debt.

We proceed then on the undisputed ground, that the state of Pennsylvania has taken to herself no illegal nor unusual advantage by the enactment of the twelfth section of the law of 1785 [2 Dall. Laws, 251], but that any balance or sum of money due from any person, ascertained and settled in the manner therein prescribed, "shall be deemed and adjudged to be a lien on all the real estate of such person throughout the state." You have observed that the settlement of the account to which the lien is given, must be confirmed by the supreme executive council. This was in 1785; in the year 1790, the people of Pennsylvania made for themselves a new constitution, or form of government; and thereby the executive power of the commonwealth was vested in the governor, and the executive council of course ceased to exist. Many acts of legislation became necessary to accommodate the laws of the state to the new government; among others to vest in the governor the power of the executive council. On the 13th of April, 1791 [3 Dall. Laws, 73], a general act was passed which enacted that the governor of the commonwealth shall have and exercise all the powers that by any law or laws were vested in the supreme executive council. The duration of this act was limited to the 1st of August following. On the 21st of September, 1791 [3 Dall. Laws, 113], the act of April was continued to December, and in the law of September, we find the following provision: "That in all cases where accounts ex-

amined and settled by the comptroller-general and register-general, or either of them, have heretofore been referred to the executive authority, to be approved and allowed or rejected by the governor, the same shall only, for the future, be referred to the governor, when the said comptroller-general and register-general, shall differ in opinion: but in all cases when they agree, only the balances due on each account shall be certified by the said comptroller-general and register-general to the governor, who shall thereupon proceed in like manner, as if said accounts respectively had been referred to him according to former laws upon the subject. And provided also, that in all cases when a party or parties shall not be satisfied with the settlement of their respective accounts by the comptroller-general and register general, or when there shall be reason to suppose that justice has not been done to the commonwealth, the governor may and shall, in like manner, and upon the same condition, as heretofore, allow appeals, or cause suits to be instituted as the case may require." The meaning and construction of these provisions have formed a prominent subject of the discussion you have heard. It is my duty therefore to give you my views of it. We must go back for a moment.

By the law of 1782 [2 Dall. Laws, 44], great powers were given to the comptroller-general, in the settlement of accounts; and no appeal was allowed from his decision, or any means given by which a party aggrieved by his settlement could bring his case before the court and jury upon its facts or its law. To remedy this injury and injustice, the act of 1785 was passed. It enacts that wherever the comptroller-general shall settle an account in pursuance of the previous law and transmit it to the executive council for their approbation, if the party be dissatisfied, he may, within one month after notice given to him by the comptroller, appeal to the supreme court on certain terms not now material. The sixth section of the law of 1785 directs that if the council be dissatisfied with the settlement made by the comptroller, they may direct a suit to be instituted against the party, with whose accounts they may be dissatisfied. This brief recurrence to previous laws will aid us in understanding the acts of September, 1791, with one additional reference. On the 28th of March, 1789 [2 Dall. Laws, 704], an act was passed for the appointment of a register-general, and the comptroller is required to submit all the accounts he shall adjust, before he shall finally settle them, to the examination of the register-general, and take his advice and assistance in making such settlement; and the settlements made by the comptroller with the aid and assistance of the register, are to be laid before the executive council. Afterwards by a law of April, 1790 [2 Dall. Laws, 787]. all accounts are ordered, in the first instance, to be submitted to the register, and

after his liquidation and adjustment to be transmitted to the comptroller for his examination and approbation, who shall in like manner transmit them to the executive council for their final approbation. Thus we see that antecedent to the law of September, 1791, the course of settling an account with the comptroller was: 1. To have it examined and adjusted by the register-general; 2. By the comptroller-general; 3. By the supreme executive council; and it was not considered to be a final settlement until it was examined, adjusted and approved by all these tribunals. All the rights of appeal by the party, and of a suit by the executive on behalf of the commonwealth, remained as they were given by the act of 1798 [4 Dall. Laws, 268].

We now come to the act of September, 1791, and the changes effected by it in the settlement of public accounts. In the first place it enacts that the reference of the accounts to the governor, or executive power, to be by him approved and allowed, or rejected, shall in future only be made when the comptroller and register shall differ in opinion. When they agree the accounts are not to be transmitted to the governor, or in any manner referred to him for his approbation or rejection, but the register and comptroller are required to certify to the governor only the balances due on the one side or on the other on each account. It is, however, provided that if the party shall be dissatisfied with the settlement, he shall have an appeal in like manner and upon the same conditions as heretofore; and so on the other hand, if the governor shall suppose that justice has not been done to the commonwealth, he may cause a suit to be instituted against the party, and in either case the whole account will be investigated and recommended by a court and jury. But if the party does not take his appeal in the manner prescribed, and the governor does not cause a suit to be instituted, both the commonwealth and the party are presumed to acquiesce in the settlement made by the register and comptroller, and it is finally conclusive upon both. Such was the law of the commonwealth for the settlement of public accounts, when the accounts of J. Nicholson, now before the court, were adjusted and settled.

We are now prepared to approach the question of lien. The right of a commonwealth to a lien on all the real estate, throughout the state, of any person for the sum or balance found due, being given by the law of 1785, we have to inquire whether such a balance or sum of money was found due from J. Nicholson to the commonwealth, in such manner and form as to give this lien to the commonwealth on all the real estate of J. Nicholson throughout this state for such balance or sum. In other words, were the accounts of J. Nicholson with the commonwealth so settled, according to the laws of this state, and the balances or sums alleged

to be due from him so found, as to entitle the commonwealth to the lien given by the twelfth section of the act of 1785? Was there, on the 31st of March, 1806, when the act was passed "for the more speedy and effectual collection of certain debts due to this commonwealth;" was there a debt due from J. Nicholson to the commonwealth; and was there a valid and subsisting lien on his real estate for the security and payment of that debt? The defendants allege the affirmative of both these questions. And they rest their proof: 1. On the settlement of certain accounts of J. Nicholson in 1796. 2. On two judgments rendered against him by the supreme court of the state in favour of the commonwealth: one on the 18th of December, 1795, the other on the 21st of March, 1797.

(1) The accounts. Three having been laid before you, and they were produced by the plaintiffs in the opening of the case, I shall take them in their order of time.

1. An account which affirms on the face of it to have been settled and entered in the office of the comptroller-general on the 3d of March, 1796, and in the office of the register-general on the 8th of March, 1796. This account is headed, "Dr, John Nicholson on account in continental certificates with the state of Pennsylvania, Cr." You will have it with you; it is therefore sufficient for me to say, that on this account there is a balance struck against J. Nicholson of 58,429 dollars 24 cents.

2. An account "settled and entered" in the office of the register-general on the 20th of December, 1796, and "approved and entered" in the comptroller's office on the 22d of December, 1796, headed "Dr, John Nicholson on account in continental certificates with the commonwealth of Pennsylvania, Cr." The balance of the former account, 58,429 dollars 24 cents, is here charged to J. Nicholson, and credits are given to him which reduce that balance to 51,209 dollars 22 cents. This balance and the former contract is stated to be carried to account on new account.

3. An account which is thus vouched by the accounting officers: "Settled and entered, Samuel Bryan, register-general officer, 30th June, 1800. December 20, 1796. N. B. This account was settled in December, 1796, but not entered in the books till the 30th of June, 1800. Also examined and entered, John Donaldson, comptroller-general officer, December 20, 1796." This account is headed, "Dr, John Nicholson, account three per cent stock of the United States, in account with the commonwealth of Pennsylvania, Cr." A balance is struck against John Nicholson of 63,729 dollars 86 cents, carried to the new account. As the lien of the commonwealth, by which the defendants maintain their right, is in part alleged to have been created by those accounts and their settlements, they have properly attracted a particular attention from both

parties, and been the subject of great part of the discussion that has been laid before you. The objections to these settlements, urged by the plaintiffs, are numerous, and I shall draw your notice to such of them as I think we may now consider. You have observed that one of these accounts has been brought before the supreme court of the state in the case of Smith v. Nicholson, reported in 4 Yeates, 6. Such of the questions now raised as were clearly decided in that case, I shall not trouble you with; I shall abide by that decision, not only on account of the obligation I am judicially under to do so, but because I am entirely satisfied with it. I speak of the law there settled. In that case the commonwealth claimed a priority over a private creditor of John Nicholson, who had taken in execution a tract of land as the property of Nicholson. The commonwealth maintained her claim by virtue of her alleged lien on all the real estate of Nicholson given to her by the law of 1785, on a certain settlement of one of his accounts, by which the sum of 58,429 dollars 24 cents, made on the 3d and 8th days of March, 1796, was found due to the commonwealth. This is one of the accounts and settlements on which the defendants now rely. The question submitted to the court was, whether the said settlement created any lien on the real estate of John Nicholson. We must observe that this is the account which was first settled and entered in the books of the comptroller-general, and afterwards settled and entered in the books of the register-general, which is here insisted upon to be a fatal irregularity. It is also expressly stated that the accounts were not transmitted and received no confirmation from the governor. These facts were then distinctly presented to the court, and their opinion given on the law of such a case.

1. That the account settled was but one of the various accounts between the commonwealth and the debtor.

2. That the settlement had been made first by the comptroller, and afterwards by the register.

3. That it had never been transmitted to the governor, or received any confirmation by him; and the question submitted to the court was, whether this settlement of their account created a lien on the lands of the debtor in favour of the commonwealth.

THE COURT then decided:

1. That the provision in the law of 1785, which creates the lien, is not repealed by any subsequent law or laws, expressly or by implication.

2. That the settlement of the account before them, made in the manner mentioned, did create a lien on all the real estate of J. Nicholson throughout the state.

This decision is the law of the case as it was presented in the supreme court of the state, and no further. The party here, who

was not a party to that suit, has a right to the benefit of any new facts which would vary the case, if there be any such. We must therefore consider such of his objections to the settlements as were not brought into view, and have not been disposed of by the judgment of the court in the case cited.

It is alleged that John Nicholson had a legal right to notice of the intended settlement of his account; that he had no such notice, and that therefore the settlement made by the accounting officers of the commonwealth was ex parte, and had no binding force on him or his property. This allegation, as an affirmative fact that he had no notice, is not supported by evidence or admission, as it was in Fitler's Case; but the case here is, that no proof has been produced that he had notice. We come at once to these questions: Was any notice necessary to give a legal validity to these settlements? May a notice be now presumed? Is there any evidence of it, which, at this distance of time, and under the circumstances of the case, ought to satisfy us that it was given, or that, what is equivalent to it, the party attended at the settlements? One of the plaintiff's counsel has insisted that the notice directed by the fifth section of the law of 1782, which is in truth a process of summons, to be issued by a prothonotary and served by a sheriff, was such a notice as John Nicholson was entitled to. On turning to the act, it, to me, is extremely clear, that the notice there has no reference whatever to accounts which should afterwards arise and be settled with the treasury of the commonwealth. It applies only to certain accounts, then of loong standing, and unsettled or not finally closed, with persons having in their hands large sums of money or effects belonging to the commonwealth, in danger of being lost, if "vigorous measures be not taken to compel such persons to settle their accounts, and discharge the balances which may appear to be due to the state." The comptroller is ordered to form lists or abstracts of the names and places of abode, &c. of such persons; and it is to them that the notice or summons is to be issued, to be followed by the subsequent proceedings, according to the act.

We recur to the question, was any notice required to be given to John Nicholson, of the intended settlements of his accounts? Certainly none is directed by the numerous acts of assembly which have been passed for settling the accounts of public debtors. It is nevertheless insisted that it is indispensable; and the opinion of the supreme court of the state is relied upon (Fitler's Case, 12 Serg. & R. 277) to prove the necessity of notices, although none may be expressly directed by the act under which an account is settled. The circumstances of that case were very peculiar, showing a strong and clear equity with the defendant, not merely in the point of notice, but in the substantial merits in controversy. Great wrong

had been done him in the settlement, and it was admitted by the accounting officer: what is more material, there were many expressions and provisions of the acts under which his accounts were settled, from which the court thought it was "manifest the legislature intended, in such case, that the party should have been summoned, or in some way or other have had notice." The case decided by the court, was very different from this; it is an authority only so far as they are the same. In the acts of the legislature we have to construe, there are no such provisions as are found in Fitler's Case, from which the court inferred a manifest legislative intention of notice. Some general expressions of the chief justice, in delivering the opinion of the court, are resorted to to sustain the objection here; such as that notice to the party, "is one of the most substantial requisites of natural justice;" that "in proportion as power approaches to arbitrary discretion, it should be restrained within the limits prescribed to it by the legislature." Again, "the word 'settlement' imports a joint act of the parties who have computed together; and an ex parte settlement (if any thing properly be so called) is contrary to the plainest principles of natural justice." This is all true, and well applied to the case before that court, in which they thought that the proceeding of the accounting officer had not been "restrained within the limits prescribed to it by the legislature;" but it would be a bold step in this, or any other court, to pronounce an act of a state legislature unconstitutional and void, on such general opinions and principles, however just in themselves; and without going thus far, they will avail nothing for the plaintiffs in this case. If, therefore, it were here proved or admitted that J. Nicholson had no notice of the settlements now charged upon him and his property, made by virtue of legislative acts, which it is admitted require no notice, I should not imagine myself to be authorized to pronounce the acts and proceedings of the legislature invalid; for the argument, on the subject of notice, followed out, ends in this, if it is to serve the plaintiffs, that the acts of 1806 are unconstitutional and void, because they ordered the sale of the estate of John Nicholson, by virtue of a lien created by a settlement of his accounts, which settlement was made without notice to him, and therefore gave no authority to the legislature to pass the acts in question; or that no lien was, or constitutionally could be created, by a settlement of accounts without notice to the parties, although the legislature had required no notice, and that such a settlement itself was illegal, and not binding on the party or his property. That is (supposing the notice not to be required by the laws), that the legislature has no power to direct a settlement of a debtor's accounts, nor to make the balance due on such a settlement, a lien

on his property without notice. Granting this to be just; is it a void act?

If the argument does not come to this conclusion, it does not help the plaintiffs. And can we soberly and judiciously bring it to this conclusion? Can we solemnly pronounce a law of this state to be void, because a notice was not given, when none was required, by the power having the clear right to say whether it should be given or not? I might think notice to be a "substantial requisite of natural justice," but in a certain case, the legislature has thought otherwise; and they had a constitutional right to think so, and to act upon their own opinion of this abstract question, as well as of its application to the case they were providing for. In Fitler's Case, the only question was, whether he should be charged with interest on the balance of his account, a question peculiarly within the equity of the court, and the opinions of substantial justice; that court was not called upon on such a point, to declare a law of the state void, and to prostrate it as an illegal assumption of legislative power. No court has yet presumed to question a legislative act, on the ground of a difference with their notions of natural justice; and no legislature would, or ought to submit to such a restriction of their authority. To affect the defendant's title, on this point of notice, we must declare that the settlement and the acts directing it, are unauthorized and void, because they give no notice, and therefore created no lien, and that the acts of 1806-07 are void, because they order a sale without settlement or lien.

If then the legislature had a right or a power to direct a settlement of the accounts of a debtor without notice to him, and they have done so, we might dismiss this objection with the remark, that however unjust we might deem it, yet as it violates no provision of the constitution, we cannot put the judicial veto on a law on this account. But I will proceed a little further with it. The counsel for the defendants have insisted, and are well supported by precedent, by principle and sound policy, in the administration of justice, that after a lapse of thirty-four years since these accounts were settled, a fair and legal presumption arises, that all was done which the law required to be done or which ought to have been done, to give validity to the settlements; that it must be presumed, in the absence of all proof to the contrary, that the appointed and sworn officers of the commonwealth who settled the accounts, performed their duties with a proper regard to the rights of the other party; that the whole proceeding was regular and lawful. But allow me to call your attention to the evidence you have had of the circumstances which may at this time be considered as proof of notice or of the attendance and acquiescence of the party, John Nicholson. It does not seem to be questioned by the plaintiffs, that slight circumstances might now be received as proof of notice; are there not such circumstances in this case? In the first place, we have the official certificates of the register and comptroller, that these accounts were "settled." If we may with the plaintiffs adopt the suggestion or allegation of Judge Gibson in Fitler's Case, that the word "settlement'" imports a joint act of the parties, can we refuse the same interpretation to the word "settled." If where the law directs a settlement of an account, it implies that both parties are to be present and acting in making it: when the officer certifies that it is settled, the same implication arises not only from the force of the term, but from the presumption that it was settled according to law. Again, the proofs of these accounts were in the hands of J. Nicholson, probably in November, 1796; in which it is severally stated, that his account was "settled" in March, 1796. If the term has the meaning now given to it, J. Nicholson had then an allegation by the accounting officers, that these settlements were by the said officers in conjunction with him, and he never denied the allegation, or the inference; but by taking, as it is asserted for him, these accounts as the basis of the judgment afterwards confessed by him, affirmed it.

On all these grounds I am of opinion, that this objection of the want of notice of the settlement of the accounts of J. Nicholson cannot avail the plaintiffs in this cause, or affect the validity of the settlements. The case of Smith v. Nicholson [4 Yeates, 6] decides, and I think very properly, that where the register and comptroller agree in the settlement of an account, the account need not be transmitted to the governor for his confirmation or revisal; of course I make no further answer to this objection: but it is argued that if this be so, yet in all cases the balances must be reported to the governor by whom the appeal is to be allowed and certified. This is true, and no such point was brought to the view of the court in the case just mentioned. The reason is obvious, the question then was, as it now is, as to the lien of the commonwealth, and which lien was given by the law of 1785, on and by the settlement of the account, and was full and complete when that settlement was full and complete, which it was on the agreement of the register and comptroller. When the further confirmation of the governor was necessary to the settlement, then the lien did not attach until that confirmation was obtained; but no act of the governor being necessary to this settlement, it at once created the lien; subject it is true to such alteration in the amount secured by it as on appeal might be found due, but if no appeal was taken, it stood for the balance found by the register and comptroller on the settlement of the accounts. This answer also will meet the objection that these accounts were not entered in the books; al-

though those produced are certified by both officers to be entered. The entry either of the whole account or the balance is no essen-tial part of the settlement; on the contrary, the account must be settled and finally, unless appealed from, before it can be entered.

It has been strongly argued that the balances must be in money, not in stock, certificates or other effects. For this I can only look to the accounts themselves, which profess to give money balances in dollars and cents. I believe no continental certificates, or certificates of stocks, were given for dollars and cents. If in this I am correct, it is clear that in stating the accounts and striking the balances, the stocks had been valued and reduced to money.

It is said that the order of settlement by the accounting officers has been reversed. There might be some embarrassment on this question, if it were material; but as accounts have been produced, settled in both ways, and any one is sufficient to give a lien to be the foundation of the subsequent acts of assembly, we need not stop to examine this objection more particularly; we are not now settling the accounts, nor inquiring which of several has given a legal balance; but whether any account has been settled so as to give a lien to the commonwealth, under the provisions of the law of 1785.

Besides the objections to these settlements by the force of which it is maintained that they created no lien in favour of the commonwealth, it has been argued that if such lien were given by them, it was afterwards lost by the judgment entered for the same debt in March, 1797, rendered in a suit brought against J. Nicholson, in the supreme court of the state to September term, 1795.

This was antecedent to the settlements. The argument is that the commonwealth had two modes of proceeding, to secure and recover moneys or effects due to her. 1. The ordinary proceeding by a suit in one of her courts, regularly prosecuted to judgment. 2. By a settlement of the account of the debtor, and the lien thereby created for the balance found due. That she could not have or use both at the same time, and in this case having made her election to proceed by suit, she can claim nothing by the settlement. It has been further strongly urged by the last counsel, in connexion with this point, that the two claims are here inconsistent, for that while the suit demands the certificate and stock as the property of the commonwealth, the accounts, by charging him with their value, consider them as the property of J. Nicholson. The declaration is produced to show this understanding of the case. This is very much a technical view of the proceeding. But this is not the only answer or explanation of it. When the suit was brought, and the declaration has reference to that period, the account had not been settled, and the certificate and stock were really the property of the commonwealth, in the

hands of the defendant. More than a year afterwards the accounts are settled between the parties, and a value is given to the certificates and stock which had been claimed in the suit, and he is charged with them at their money value. Then they become the property of J. Nicholson, and he becomes indebted to the commonwealth for the value; the account is accordingly so settled, with all the legal effects of the settlement. At the next meeting of the court, in March, 1797, when the cause is called for trial, a judgment is given and taken for the money value, previously accorded to the certificates and stock: and the result of the whole operation is, that the commonwealth has a settlement, lien and a judgment at the same time, against the same person for the same debt. If there is anything illegal or unusual in this, it is unknown to me. Are not the instances without number, in which a party is allowed to have two or more securities, and two or more remedies for the same object or debt, which he may prosecute sometimes together and sometimes successively without impairing either? If the judgment did merge and destroy the lien; could it do so without becoming its substitute and as fully serving all the purposes of the defence? To avoid this conclusion, the plaintiffs have made an extraordinary effort. They argue at one time that no lien can be claimed by virtue of the settlements, because neither the commonwealth nor her accounting officers, had any such expectation or intention: and the judgment of March, 1797, is invoked to demonstrate the truth of this allegation. At another time they argue that the commonwealth can have no advantage in these sales from the lien of her judgments, because the legislature had no such expectation or intention, but looked altogether to the settlement liens. By this ingenious process of reasoning, the commonwealth is made to destroy her own rights, by her own intentions; and it is not the least remarkable feature in the argument, that she has done this by the very acts by which we may say she supposed she was strengthening and securing those rights. In 1797 she abandoned the settlements to rely upon her judgment: and in 1807 she abandoned the judgment to resort to the settlements which she had surrendered and lost ten years before.

If the defendants are to be deprived of the liens of the law of 1795, they then go to the judgments obtained by the commonwealth against J. Nicholson, as sufficient to support the sales ordered by the acts of 1806 and 1807, and their titles derived from those sales. And why are they not? Why are these judgments not such liens as satisfy the provisions of those acts and afford a foundation for the proceedings thereby directed? The only pretence set up by the plaintiffs against them is, that the legislature did not intend it, with a reference to a section in one of the acts which relates to a dispute with the Asylum Company, to support the allegation. Can I

say that the legislature did not intend to exercise all the rights which these judgments gave to the commonwealth? Can I say, by a forced and remote inference, that they intended so great a wrong to the interests they were bound to protect? I turn to the acts for this intention, and do not find it any where declared or expressed. I find no abandonment of any right the commonwealth had against J. Nicholson or his property, for the recovery of the debt he owed to her. The language of the acts is of sufficient comprehension to include the liens by the judgments —indeed as fully and clearly as the liens by the settlements—and there is no more exception of the one than of the other. The various provisions of these acts relate to the lands of J. Nicholson, subject to the lien in one act, and to the liens in the other, of this commonwealth. I look in vain for any reason, legal or logical, to induce a belief that the legislature, in their acts of 1806 and 1807, intended to relinquish the lien which the law gave them upon the lands of J. Nicholson, by virtue of the judgments against him.

If the law of 1785 is a good and valid act of legislation, and if, either by virtue of settlements made of the accounts of J. Nicholson, or by the judgments rendered against him at the suit of the commonwealth, there was in 1806 a legal and subsisting lien on all his real estate within the state, the only remaining question is, whether the acts of 1806 and 1807, or such parts of them as are necessary to the title of the defendants, are valid and constitutional laws, or whether they violate any of the provisions of the constitution of the United States, or of the constitution of Pennsylvania, and are so inconsistent with them, or either of them, that it is the right and duty of the court to declare them to be null and void. The power and right of the court to do this has been freely admitted by the counsel on both sides; indeed I do not see how it is possible to doubt it. If we are bound faithfully to administer the law of the land, if it is our duty to give to every suitor the rights he is entitled to under that law, it follows that it is our right and duty to seek for that law in the declared will of the people, who alone have the power to make it; and if in this search we find conflicting acts, both professing to be the will of the people, we must yield submission to the greater or paramount law, and disregard the inferior.

That the constitution is that paramount law, and that acts of legislation are subordinate to it, cannot be denied, and the consequence is, that where they cannot be reconciled, where both cannot be executed, the courts, when called upon to declare the law, must give effect to the constitution, and annul the act which would violate and defeat it. This is, however, a high exercise of power, and should always be attempted under a deep sense of the responsibility assumed by the court, with a profound respect for the legislative body, and anxious desire to give effect to both acts, if they can be reconciled. The incompatibility must not be speculative, argumentative, or to be found only in hypothetical cases or supposed consequences. It must be clear, decided and inevitable, such as presents a contradiction at once to the mind, without straining either by forced meanings or to remote consequences. It is the constitution that must be violated, and not any man's opinions of right and wrong, or his principles of natural justice. These are uncertain standards of legislative power, and must be referred to the discretion of those to whom the people have given that power, and to whom they must answer for an abuse of it. Under the direction of these principles, I approach the constitutional objections that have been made to the acts of the legislature of Pennsylvania of 1806 and 1807, and shall give to them a distinct and separate consideration. They are charged with oppression, injustice, partiality, an injurious departure from the ordinary modes of proceeding, and a total disregard to the rights and interests of others in the pursuit of the rights and interests of the state. If all this were true, there may nevertheless be evils for which we are not authorized to administer a remedy; there may be injuries we cannot redress, and errors we cannot correct; our power over the subject is measured to us by the constitution, and we must take care that in our zeal to redress real or supposed wrongs, we do not commit a greater wrong. If we agree that the state of Pennsylvania has exercised her authority with a strong arm and a selfish spirit, if she has been a hard creditor, still this will not bring us to the point where we may array the federal power against her acts, and demand of her to surrender the advantages she has thus obtained. If the authority she has exercised be her right, we have no control over the manner in which she may choose to use it. It has been more than once urged upon you that it is the liberal and humane policy of Pennsylvania to postpone the payment of debts due to herself, and to pay individuals first. There is such a provision in the law of 1794, directing the order for the payment of the debts of a decedent by executors or administrators; but does this furnish a rule for any other case? Has it ever done so? If by a general law (not the constitution) debts due to this commonwealth were in all cases to be paid last, would this take from the legislature the power either to repeal the law altogether, or to alter it in a special case for reasons thought by them to be sufficient, which would be a repeal pro tanto? Other states claim a priority in all cases, and can it be unconstitutional or unjust in the legislature of Pennsylvania to do so in a very peculiar case, taking upon themselves to judge of the reasons.

The acts in question are alleged to be illegal:

1. Because they authorize a sale of the lands of the debtor without a previous inquisition to ascertain whether their rents and profits would not pay the incumbrances on them in seven years. We ask, what is the right of a debtor to this inquisition? How does he derive it? Assuredly not from the constitution, nor from those natural and eternal principles of justice which have been so often mentioned. It is the gift of legislative indulgence, a mere gratuitous benevolence to the debtor in derogation of the rights of the creditor, who on strict principles of justice ought to have his money immediately—ought to be allowed to make his debtor's property available to pay his debt without delay, and not be compelled to take the possession and care of an estate he does not want, and wait for its slow and uncertain proceeds for the payment of a debt which, by the contract of the debtor, was to have been discharged long before. This right is by no means so sacred as has been supposed, nor a resumption of it so unusual. The legislature has not hesitated to withdraw it when they thought the public interest required it. Lands are sold for taxes without an inquisition, and by a very summary process, and this has never been deemed illegal or oppressive. Further, the courts of the commonwealth have taken upon themselves the authority to dispense with this proceeding in many cases in which they believed it would be useless, as in cases of levies on unseated lands, on vacant town lots, on uncertain estates in land. It would be strange to say, after such precedents, that the act of 1807 is unconstitutional and void, because it orders a sale of J. Nicholson's land without an inquisition, or even to complain of it as unusual, oppressive and injurious, especially as, so far as we are informed of the situation of these lands, the inquisition would not have been necessary for a sale under a judgment and execution. Who has been injured, who oppressed by this proceeding? (I mean the omission of the inquisition). Neither J. Nicholson nor his creditors. On the contrary, a great and useless expense has been avoided, which would have consumed no inconsiderable portion of the proceeds of the sales to the loss of J. Nicholson and his creditors.

As connected with this part of the argument, I will now remark, that the sales by the commissioners instead of by the many sheriffs of the many counties in which the lands lie, has the same effect in saving expenses and charges which would exhaust the fund. It is replied that the state has saved perhaps five per cent by giving ten to the commissioners. But it must be observed, this ten per cent was paid by the state out of her moneys and constitutes no charge upon J. Nicholson or his creditors.

2. The want of a public notice of these sales, has been urged against the legality of this act; and this is presumed because no proof of notice has been given. I cannot allow the inference. By the express enactment of the law, the deed of the commissioners is declared to be prima facie evidence of the grantee's title, and of course of the regularity of their proceedings. If there was not a provision of the law, I should certainly, in the first instance, presume, at this late day and under the circumstances of the case, that the proceeding had been regular, and the notice required by the act given. The legislature provided liberally for this notice; much more so than the debtor would have been entitled to, if his land had been sold under the executions. In that case the notice of the sale would have been "by so many writings upon parchment or good paper, as the debtor shall reasonably request to be put up in the most public places of the county at least ten days before the sale." By the act of 1807, it is ordered that "in all cases of sales to be made by the commissioners, at least twenty days notice shall be given of the time and place of sale, by advertisement in the newspaper printed in the county where the lands respectively lie, if any be there printed, and if not, in the newspaper printed nearest to such county, and also in two papers printed in the city of Philadelphia." The notice here directed is similar to, if not the same, with that directed of sales of unseated lands for taxes.

3. The power given to the commissioners to make compromises with persons who may allege title to any of the lands, has been vehemently complained of, and even declared to be unconstitutional. What is the ground of this complaint and charge? How is this an unconstitutional grant of power? Does the state assume any right that any individual would not possess in like circumstances? When about to sell a tract of land as the property of J. Nicholson, to satisfy a debt due by him, a third party sets up a claim to the land. Instead of encountering the trouble, expense and delay of litigation to decide this question, the state offers a compromise, and authorizes the commissioners or agents to arrange the terms of the compromise, and to bind her finally and conclusively by their decision and agreement; "their proceedings shall be final and conclusive upon the commonwealth," not upon John Nicholson or his creditors, who have not the most remote interest in this proceeding. It is an arrangement and contract, in its terms, in its object and in its effect, wholly between the commonwealth and the claimant of title to the land; it touches no right of J. Nicholson or his creditors; it deprives them of nothing, and makes no change in their condition or relation to the land, to each other, or to the commonwealth. As respects the rights of J. Nicholson and his creditors, every thing remains as before.

When a compromise is effected, what are the commissioners authorized to do? "To execute and deliver an assignment of so much of the liens of the commonwealth against the estate of J. Nicholson as may be equivalent to the consideration paid; and the holders of the assignment "may at any time proceed upon the liens to sell the lands which were the subject of compromise." Was not this an assignable right or interest; and when assigned, would not the assignee hold all the rights of the commonwealth in the subject assigned, and no more? Whatever objections of law or fact J. Nicholson or his creditors could have opposed to this lien or any proceeding under it while it remained in the hands of the commonwealth, they could oppose with like effect to the assignee holding from the commonwealth.

The purchaser of the lien stands precisely in the place of the state, with no greater rights than she had, and no greater wrong to J. Nicholson or his creditors. The only difference is, in case of a controversy they will have an individual instead of the commonwealth for their antagonist. Is this complained of as an injury? What provision or principle of the constitution is violated by it?

While the objections to these laws we have just considered were charged to be violations of the constitution, the charges were left on the general allegation and argument, but no attempt was made to designate the articles or provision of the constitution which it was supposed were violated. On some other points the counsel for the plaintiffs have been more specific in their objections under this head, and have referred us to parts of the constitution of the United States and of Pennsylvania, which they allege to be infringed. They assert that these acts impair a contract, or the obligations of a contract. That they take away the trial by jury and deprive a citizen of his property without the judgment of his peers. You are familiar with the parts of our constitution to which these allegations refer, and it is unnecessary for me to recite them. We proceed to inquire what contract or obligation of a contract has been impaired by these laws or either of them? The plaintiffs have mentioned two: 1. The original contract between J. Nicholson and the commonwealth for the sale and purchase of the land. 2. The contract or agreement made between them when the judgment was entered against him in the supreme court of Pennsylvania. (1) The contract for the purchase of land. The argument is that John Nicholson had by his warrant, survey and the payment of money to the commonwealth acquired an equitable or inchoate title to these lands, and that the commonwealth had bound herself to complete this title by delivery to J. Nicholson of a legal deed of conveyance, but that by selling these lands under the laws in question, she had put it out of her power to complete or perform this part of it; and thereby has virtually violated it. Let us consider whether by these laws the commonwealth repudiated any right she had given to John Nicholson by her contract with him; and whether she had disabled herself from doing any thing she was bound to do by that contract. What had she done? She had vested in him the property of these lands; he had legally acquired the property in them. Does she deny it, or resume it by these acts? By no means; on the contrary, all the proceedings directed by these laws are founded on the basis that the lands are the property of J. Nicholson, and as such liable to the liens of the commonwealth. What says the first act on this point? The commissioners are ordered to procure copies of deeds and other writings relating to the real estate of John Nicholson, to ascertain the quality of the estate of John Nicholson, subject to the lien of the commonwealth. Through every section of this act the lands to be sold under it are invariably spoken of and described as the estate or property of J. Nicholson. So of the act of March, 1807. The governor is to issue process to the commissioners to sell such lands as they may specify "as the property of the late John Nicholson." The purchaser is to receive a deed for the property sold to him "as and for such estate as the said J. Nicholson had and held the same at the time of the commencement of the liens of the commonwealth against the estate of the said John Nicholson." A scrupulous regard is here paid to the right of any citizen who may have acquired any right in these lands from John Nicholson between the period of his purchase from the commonwealth, and the commencement of the lien, a space of more than two years. The original contract then, it is evident, was unaffected, nay it was in terms affirmed by the laws of 1806–07. Did these impair her further undertaking to give a deed or patent for the premises? In the first this undertaking was not absolute, but depended on contingencies or things to be further performed on the part of the purchaser. But let that pass! Can it be denied that the right of property which John Nicholson had in these lands was such as he might alienate and transfer to another? that it was such as might be taken and sold by process of law for his debts, and that his alienee or the purchaser at a sale for his debts would acquire all his interest, all his title, and all his right to any further assurance of title. This part of the contract of the commonwealth is neither violated, impaired or diminished by the passing of the land from John Nicholson to any other person, but it follows and sticks to the soil, and becomes vested in any and every legal owner of the

soil. The sale under the law of 1807 manifestly has no more effect upon the obligations of the commonwealth to complete the inchoate title sold to John Nicholson in 1794, than if the land had been assigned by John Nicholson to a bona fide purchaser, or sold under a judgment and execution from one of the courts of the commonwealth.

We will now briefly inquire how these acts violate or impair the agreement made at the time when the judgment was entered. in March, 1797. This agreement we have on the records of the supreme court of the state, and is now fully before us. It is agreed on the part of J. Nicholson, that a judgment be entered against him for the sum of 110,000 dollars 89 cents, rating the stock for which the suit was brought at certain specified prices. It is stipulated that "in the set off the stock be allowed at the same rate, the defendant to be allowed three months to point out any errors to the satisfaction of the comptroller-general and register-general; such errors to be deducted from the sum for which the judgment shall be entered." Errors, if any, against the commonwealth, are also to be corrected. The agreement concludes, "the sum for which judgment is now entered to be altered by the subsequent calculation of the comptroller-general alone." What are we to understand by this? That the commonwealth claims of J. Nicholson on that suit the sum of 110,000 dollars 89 cents; that J. Nicholson, having then nothing to show to diminish that sum, agreed that a judgment should be entered against him; a final judgment for that amount: but supposing that he might show himself entitled to some reduction or set off, or might detect some error in the account, a right is reserved to him to do so, provided it was done within three months. If within that period he had shown an error or a further credit, he was entitled to do so. What effect would that have had on the judgment? It would neither have opened it, nor in any manner disturbed it, nor have entitled J. Nicholson to any further trial before a jury. It would have lessened the amount to be paid in satisfaction of the judgment, and for which an execution might be issued, and nothing more; nor even this, unless the comptroller and register were satisfied of the justice of the deduction demanded. But J. Nicholson lived for several years after the date of this agreement, and never pointed out an error or claimed any deduction or set off, as far as we are informed. Further, an execution issued on that judgment two years before J. Nicholson's death, and we know of no objection made to it by him, or any allegation or pretence that it was contrary to the agreement for entering the judgment.

It has been finally argued that these laws violate the contract made by the commonwealth when she sold them, that they should be subjected to the payment of the debts of the purchaser only in the usual mode by which other lands of any other citizen were subject. We ask, where is this contract or any evidence of it? Again, how has it been shown that the lands of any other citizen, being a debtor to the commonwealth, might not have been subjected to the same proceedings? The plaintiffs must sustain both these positions to give any force to the argument. In this case it is not only the lands of J. Nicholson, bought of the commonwealth, that are subjected to the provisions of these laws, but all his real estate. however he may have obtained it. The effect of this argument would be to render the law void as to the real estate purchased of the commonwealth, and good and constitutional as to all the rest. The case of Stoddard v. Smith, 5 Bin. 355, sufficiently answers this objection. Certain lots in the city of Washington were sold, and bonds and notes taken for the purchase money. These not being paid, the commissioners resold the lots, agreeably to an act of the legislature of Maryland, passed subsequently to the contract of sale; and it was contended that this impaired the validity of the contract and was therefore unconstitutional. The supreme court of this state said, No; it does not impair the contract, but merely gives a new remedy. This act of Maryland gave a special procedure in a particular case which has been so strongly urged as unconstitutional against the acts of Pennsylvania. If the process to sell the land in 1798, was not a violation of the agreement, how is the process for the same purpose a violation in 1807, provided it is clear of other objections?

We proceed to the other objections, on constitutional grounds.

1. It is a judicial act. The position that a legislature cannot constitutionally perform a judicial act, is supported by no authority: nor has it any reason in public policy or convenience. On the other hand it is contradicted by legislative usage and the highest judicial decisions. It is true, as has been argued by the plaintiffs, the constitution of Pennsylvania divides the powers of government under three general heads of legislative, executive and judicial: that it ordains that "the legislative power of the commonwealth shall be vested in a general assembly, which shall consist of a senate and house of representatives," that "the supreme executive power shall be vested in a governor," and that "the judicial power shall be vested in a supreme court," &c. This, however, is only a declaration of the general system or theory of our government, and was never intended to fix exact and impassable limits to each department. There are things necessary to be done in the administration of the government, of a character so mixed and blended. partaking of the elements of all these divisions of power, that we could not know to which to assign it; it could not be

exclusively claimed by either. If, however, the acts performed in this case by the legislature were clearly judicial, they are not therefore unconstitutional and void. So have the supreme court adjudged in several cases, at least in relation to the constitution of the United States; so have the courts of Pennsylvania repeatedly said, sitting under the constitution of Pennsylvania, and deciding upon acts of the legislature partaking largely of judicial functions. That this division of power is not to be taken so strictly as the plaintiffs contend for, is manifest from the unquestioned laws that have been produced upon this trial, treated and claimed by both parties as good and valid acts of legislation, in which you have seen judicial powers, strictly such, given to the executive in the settlement of the accounts of persons with the commonwealth. This is a question of debtor and creditor, of charges and vouchers between the commonwealth and a citizen, and the governor is constituted the tribunal to decide it, with all the powers of a judge and jury, in all cases where the register and comptroller shall differ. The whole judicial authority in such cases is vested in the governor; he decides the law and the fact; he receives or rejects evidence; he exercises, indeed, higher and greater judicial powers, than are given to any court, between citizen and citizen.

I have given this consideration to the question, because it has been so seriously insisted upon by the counsel for the plaintiffs. But how does this objection stand in point of fact? What judicial power was exercised by the legislature in these acts? I can discover none. They do not decide the question of indebtedness of J. Nicholson to this commonwealth, nor its amount. This was finally and conclusively done, not only as regards J. Nicholson, but the commonwealth also, by a settlement of an account more than ten years before. It was also done as conclusively by a judgment confessed by J. Nicholson in the supreme court of the state, the supreme judicial power, ten years before. There was nothing left on this head to be decided by any authority. Does then the act decide the other question between the commonwealth and J. Nicholson, that is, the alleged lien on all his real estate? Not at all. It neither creates the lien nor gives it any strength or legality that it had not before. The lien had been created by a law of the commonwealth passed more than twenty years before, and acted upon in relation to all public debtors from that period. In 1807, the legislature, taking the debt as it had been legally and finally ascertained by a settlement of the account of J. Nicholson, or as it had been confessed and admitted in March, 1797, by J. Nicholson himself, and taking this lien as it had been given by the law of 1785, proceed to collect their debt, and enforce their right by the provisions of the laws now questioned. They are truly and strictly, as has

been argued for the defendants, remedial acts to enforce a right, not to give it; to collect a debt, not to adjudge it to be due.

These observations will also serve as an answer, or at least as expressing my opinion of the objection that has been so pressed upon these laws as being made in violation of the constitutional right to a trial by jury. Trial by jury should be as heretofore. This is true, but it must be in a case in which there is something for a jury to try. On a careful examination of these acts, I have been unable to see a simple fact or enactment in which J. Nicholson or his heirs have the least interest or concern which could, by any of our forms of proceedings or principles in the administration of law, be submitted to a jury for any purpose or in any shape. Was it the province of a jury to decide upon the powers given to the commissioners, the process or proceedings directed in order to make the sales, the terms of sale, the manner of sale, the authority to make compromises? In short, if a trial by jury were this moment offered to the heirs of J. Nicholson, in relation to any of the provisions or matters contained in these laws, I know not what they could point out as a subject upon which a jury could act within the ordinary and established limits of their jurisdiction or authority. There is no novelty in this proceeding as to the material matters of fixing the debt and selling the lands of the debtor without the intervention of a court or the use of the ordinary process of the law. The ordinary taxes apportioned upon every citizen by assessors and commissioners, may be collected by a summary sale of the goods and chattels of a delinquent, on a very short notice. The taxes assessed on unseated lands, whose owners may reside at any distance, may be sold for such taxes without the aid of any court, or jury, or inquisition, under the authority of county commissioners, and by a course of proceedings very similar to that provided by the acts now in question, and very different from the ordinary modes of proceeding to recover debts. These revenue laws have never been questioned as infringing the right to a trial by jury, or violating any part of the constitution.

Some other provisions of the constitution of the United States and of Pennsylvania have been referred to, especially those which declare that no man shall be deprived of his property unless by the judgment of his peers, or the law of the land. The construction put upon this clause in the constitution is repudiated by the opinion of the court in Stoddard v. Smith, already referred to. It does not mean that his property may not be made to answer for his debts in any other way than by the usual and established modes of proceeding to recover debts, and the general laws of the land on that subject. A direct act of legislation to take his property and give it to another, or to the commonwealth, might be liable to the exception. But when

a man holds property which is subject to his debts, is a law unconstitutional which directs a proceeding by which this property is made to produce the money or debt to the payment of which he was liable? Is this depriving him of his property against or without the law of the land? The objection made to these laws arising from the sections in relation to the asylum company, appears to me to have no unconstitutional enactments, even as regards that company, much less any of which the present plaintiffs can avail themselves. I also pass over the lien claimed by the defendants in virtue of the general law of Pennsylvania, by which the debts of a decedent are charged upon his lands. If necessary hereafter the defendant will have the benefit of these laws.

Upon the whole, and the best consideration I have been able to give this long and interesting case, during a trial in which my attention has been so much absorbed by the arguments of the most able counsel, coming out in their utmost strength, with great labour and long preparation, I am of opinion:

1. That the accounts between John Nicholson and the commonwealth, or some of them, were so settled and adjusted that the balances or sums of money thereby found due to the commonwealth, were good and valid liens on all the real estate of John Nicholson throughout the state of Pennsylvania.

2. That the judgments rendered by the supreme court of the state in favour of the commonwealth against John Nicholson, also constituted good and valid liens upon all his real estate throughout the state.

3. That the several acts of the general assembly of Pennsylvania passed on the 31st of March, 1806, and on the 19th of March, 1807, are not repugnant to or in violation of the constitution of the United States, or of Pennsylvania, but that they are good and valid laws, and a rightful exercise of the powers of the legislature of Pennsylvania. The whole law of the case is therefore in favour of the defendants.

Verdict and judgment for defendant.

On a writ of error to the supreme court, the judgment in this case was affirmed. 7 Pet. [32 U. S.] 469.

[NOTE. Upon the question of the constitutionality of the acts of the legislature of Pennsylvania Mr. Justice Johnson, who delivered the opinion of the supreme court, said: "We shall search in vain in the constitution of the state or of the United States, or even in the principles of common right, for any provision or principles to impugn them; and on this point I am instructed to report it as the decision of this court that the words used in the constitution of Pennsylvania in declaring the powers of its legislature are sufficiently comprehensive to embrace the powers exercised over the estate of Nicholson in the two acts under consideration, and that there are no restrictions, either express or implied, in that constitution, sufficient to control and limit the general terms of the grant of legislative powers to the bounds which the plaintiffs would prescribe to it." 7 Pet. (32 U. S.) 546.]